# Exhibit A

# Chimicles & Tikellis LLP

ATTORNEYS AT LAW

One Rodney Square
P.O. Box 1035
Wilmington DE 19899
Telephone: {302} 656.2500
Telecopier: {302} 656.9053
E-mail: Mail@Chimicles.com

Nicholas E. Chimicles
Pamela S. Tikellis *
James R. Malone, Jr.
Michael D. Gottsch
Robert J. Kriner, Jr. *
Steven A. Schwartz
M. Katherine Meermans
Candice L.H. Hegedus
Brian D. Long *
Joseph G. Sauder
Kimberly M. Donaldson
Daniel B. Scott
Fatema E.F. Burkey
Robert R. Davis *
Kimberly Marisa Litman
Timothy Newlyn Mathews
A. Zachary Naylor *

OF COUNSEL
Morris M. Shuster
Denise Davis Schwartzman
Anthony Allen Geyelin

*Attorneys admitted to
practice in Delaware

July 13, 2005

**VIA REGISTERED MAIL,**
**RETURN RECEIPT REQUESTED**
Abbott Laboratories
Attn: General Counsel
100 Abbott Park Road
Abbott Park, IL 60064

Re:   *Cindy Cornin v. Abbott Laboratories, et al.*, C.A. No. 05-482

To Whom it May Concern:

Enclosed please find copies of the Summons and Complaint in connection with the above-captioned matter pending in the United States District Court, District of Delaware.  The Summons and Complaint were served on the Secretary of State pursuant to 10 Del. C. § 3104.  Such service is effective as if personally served on you within this state.

Very truly yours,

A. Zachary Naylor

AZN/ce
Enclosures

HAVERFORD OFFICE
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
Telephone: {610} 642.8500
Telecopier: {610} 649.3633

⸙AO 440⸱(Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

District of _____ Delaware _____

CINDY CORNIN, on behalf of
themselves and all others similarly
situated,

V.

ABBOTT LABORATORIES,
FOURNIER INDUSTRIE ET SANTE,
and LABORATORIES FOURNIER,
S.A.

**SUMMONS IN A CIVIL CASE**

CASE NUMBER:     0 5 –    4 8 2

TO: (Name and address of Defendant)

Abbott Laboratories
100 Abbott Park Road
Abbott Park, IL 60064
By serving the Delaware Secretary of State as statutory
agent under 10 Del. C. §3104

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

A. Zachary Naylor
Chimicles & Tikellis LLP
One Rodney Square
P.O. Box 1035
Wilmington, DE 19899

an answer to the complaint which is served on you with this summons, within _____20_____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the
Clerk of this Court within a reasonable period of time after service.

PETER T. DALLEO

_____       DATE        7-11-05
CLERK

⸙Bet Dui⸙
(By) DEPUTY CLERK

AO 440 (Rev. 8/01) Summons in a Civil Action

| RETURN OF SERVICE | | |
|---|---|---|
| Service of the Summons and complaint was made by me(1) | DATE | July 12, 2005 |
| NAME OF SERVER *(PRINT)*<br>Corey Armideo | TITLE | Process Server |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served: _____

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

　　Name of person with whom the summons and complaint were left: _____

☐ Returned unexecuted: _____

☒☒ Other (specify): **Served: Abbott Laboratories c/o Delaware Secretary of State, Townsend Building, Dover, DE. Copies thereof were accepted by P. Johnson at 1:23 p.m.**

| STATEMENT OF SERVICE FEES | | | |
|---|---|---|---|
| TRAVEL | SERVICES | | TOTAL |

## DECLARATION OF SERVER

　　I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on ___7-13-05___　　___Corey Armideo___
　　　　　　　　　　Date　　　　　　Signature of Server

**Tristate Courier & Carriage**
**824 North Market Street**
**Wilmington, DE 19801**

*Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

District of _____ Delaware _____

CINDY CORNIN, on behalf of
themselves and all others similarly
situated,

V.

ABBOTT LABORATORIES,
FOURNIER INDUSTRIE ET SANTE,
and LABORATORIES FOURNIER,
S.A.

**SUMMONS IN A CIVIL CASE**

CASE NUMBER:    0 5 - 4 8 2

TO: (Name and address of Defendant)
Abbott Laboratories
100 Abbott Park Road
Abbott Park, IL 60064
By serving the Delaware Secretary of State as statutory
agent under 10 Del. C. §3104

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

A. Zachary Naylor
Chimicles & Tikellis LLP
One Rodney Square
P.O. Box 1035
Wilmington, DE 19899

an answer to the complaint which is served on you with this summons, within _____20_____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the
Clerk of this Court within a reasonable period of time after service.

PETER T. DALLEO

DATE    7-11-05

_____
CLERK

_____
(By) DEPUTY CLERK

AO 440 (Rev. 8/01) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[1] | July 12, 2005 |

| NAME OF SERVER (PRINT) | TITLE |
|---|---|
| Corey Armideo | Process Server |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served: _____

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

   Name of person with whom the summons and complaint were left: _____

☐ Returned unexecuted: _____

XX Other (specify): **Served: Abbott Laboratories c/o Delaware Secretary of State, Townsend Building, Dover, DE. Copies thereof were accepted by R. Johnson at 1:23 p.m.**

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on __7-13-05__    _____
                Date              Signature of Server

**Tristate Courier & Carriage**
**824 North Market Street**
**Wilmington, DE 19801**

_____
Address of Server

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CINDY CRONIN, on behalf of herself and all others similarly situated,<br><br>                                     Plaintiff,<br><br>                v.<br><br>ABBOTT LABORATORIES, FOURNIER INDUSTRIE ET SANTE, and LABORATOIRES FOURNIER, S.A.,<br><br>                                     Defendants. | Civil Action No.<br><br><br>**JURY TRIAL DEMANDED**<br><br>**CLASS ACTION COMPLAINT** |

## CLASS ACTION COMPLAINT

Plaintiff Cindy Cronin ("Cronin"), individually and on behalf of all others similarly

situated, for her complaint against defendants Abbott Laboratories ("Abbott"), Fournier Industrie

et Sante, and Laboratoires Fournier, S.A. (collectively "Fournier" and collectively with Abbott

"Defendants"), upon knowledge as to herself and her own acts, and upon information and belief

as to all other matters, alleges as follows:

## NATURE OF THE ACTION

1.    This class action is brought under the federal antitrust laws and the antitrust

and/or deceptive practice statutes of the below-listed indirect purchaser states to remedy anti-

competitive actions by Defendants to foreclose generic competition for cholesterol-lowering

drugs that contain the active pharmaceutical ingredient ("API") fenofibrate. Abbott and Fournier

market, and have marketed, fenofibrate products under the brand-name TriCor®. In the past

1

year alone, Abbott and Fournier total sales of TriCor® products exceeded $750 million.

2.    Abbott and Fournier have implemented and are pursuing a scheme to unlawfully maintain and prolong their monopoly position in the market for fenofibrate products. This scheme abuses aspects of the complex health care delivery system and regulatory environment to deprive doctors and consumers of an opportunity to choose generic versions of fenofibrate formulations. The scheme delays or prevents entry into the relevant market of manufacturers with competing generic fenofibrate formulations by shifting the market to "new and improved" formulations that are altered only to avoid bioequivalence with the earlier formulations, and then withdrawing their initial formulations from healthcare databases. The withdrawal of initial formulations from healthcare databases is unnecessary to market Defendants' "new and improved" formulations, and has the purpose and effect of erecting substantial barriers to entry on would-be generic competitors by ensuring that once a generic company is able to launch a competitive fenofibrate product, it will have to do so without the benefits of generic classification that would have been available but for the scheme. Because the old formulation branded product no longer exists, the new competitive product: (i) cannot be marketed as a generic; and (ii) cannot be substituted for Abbott's and Fournier's next generation TriCor® products.

3.    Abbott's and Fournier's unlawful and anticompetitive scheme to thwart generic entry of fenofibrate products includes the following:

(a)    Abbott and Fournier bring a TriCor® product formulation to market;

(b)    Faced with the prospect of generic competitors bringing to market lower-cost bioequivalent generic versions of that TriCor® formulation, Abbott and Fournier engage in

2

a range of practices which have the purpose and effect of delaying the launch of competitive

generic formulations until after Defendants launch a "new" TriCor® formulation;

(c)    Defendants reap monopoly profits by charging supracompetitive prices

during the exercise of their delay tactics, which block competitive generic drug rivals from the

fenofibrate market. These prices are far higher than the prices generic competitors would charge

if they were able to sell their bioequivalent versions of TriCor® products;

(d)    Once market entry by competitive generic drug products appears

imminent, Abbott and Fournier begin selling a "new" formulation of a TriCor® product. This

"new" formulation is the same medicine as the existing formulation and has the same

indications; Defendants merely alter the delivery mechanism (i.e. capsule or tablet form) and the

milligram quantity.

(e)    Abbott and Fournier take affirmative steps to convert customers from the

existing formulation to the new formulation before the competitive generic products are available

for sale;

(f)    Despite Abbott's and Fournier's efforts at customer conversion, not all

patients or doctors switch from the old formulation to the new formulation. Thus, Abbott and

Fournier take additional steps to eliminate the generic market for the old formulation, as well as

customer choice: In 2002, Abbott and Fournier removed its brand reference for TriCor®

capsules from the National Drug Data File® ("NDDF"). As a result, the branded drug code

reference no longer exists for purposes of generic substitution laws or health care providers'

pharmaceutical benefit programs. Defendants stand poised to repeat this maneuver with its

market shift to new tablet formulations.

3

4.    As a result of this scheme, once a generic manufacturer is able to start selling a product that is bioequivalent to the old TriCor® formulation - and therefore could be substituted by a pharmacist for the old product — the market for that product has been switched to the new product. Because the would-be generic formulation is bioequivalent only to the old brand formulation, pharmacists and others cannot legally substitute the product for the new TriCor® product, even though the products are indicated for the same uses. The product switch and the withdrawal of the NDDF code effectively eliminates generic competition which otherwise would have arisen.

5.    Defendants' conduct unreasonably restrains competition. If Abbott and Fournier simply launched their new products, consumers would benefit from the existence of competition in sales of fenofibrate products. Instead, because Abbott and Fournier have improperly staved off generic competition and could potentially continue to do so indefinitely, Plaintiff and members of the Class have been forced to pay supracompetitive prices for, and are deprived of choices among, fenofibrate products.

6.    This class action is brought on behalf of all persons or entities that purchased or paid for fenofibrate products, including TriCor® products, since April 9, 2002.

7.    Plaintiff seeks on behalf of herself and the Class to enjoin, pursuant to §16 of the Clayton Act, 15 U.S.C. § 26, Defendants from continuing their unlawful monopolistic practices in violation of §2 of the Sherman Act, 15 U.S.C. §2. Plaintiff and the Class do not seek relief under §4 of the Clayton Act, 15 U.S.C. § 15.

8.    Plaintiff also seeks on behalf of herself and the Class damages for Defendants' violations of the antitrust and/or deceptive practice statutes of Arizona, California, District of

4

Columbia, Florida, Iowa, Kansas, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia and Wisconsin (collectively, the "Indirect Purchaser States").

9.    Plaintiff further seeks on behalf of herself and the Class equitable remedies as to Defendants' unjust enrichment.

## JURISDICTION AND VENUE

10.    Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. §§ 22 and 26. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367(a).

11.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), which provides federal district courts with original jurisdiction over civil actions in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and is a class action in which "any member of a class of plaintiffs is a citizen of a state different from any defendant."

12.    Venue in this District is proper under 15 U.S.C. §22 and 28 U.S.C. §1391(b) because Defendants are found or transact business within this District, and the interstate trade and commerce, hereinafter described, is carried out, in substantial part, in this District.

## TRADE AND COMMERCE

13.    At all relevant times, TriCor® was manufactured by Defendants and was thereafter sold, shipped and transported across state lines to United States customers located outside the state of manufacture. In connection with the purchase and sale of TriCor®, monies,

5

as well as contracts, bills, and other forms of business communications and transactions, were transmitted in a continuous and uninterrupted flow across state lines. Various means and devices were used to effectuate the Defendants' actions alleged herein, including the United States mail, interstate travel, interstate telephone commerce, and other forms of interstate electronic communications. The activities of Defendants alleged herein were within the flow of, and have substantially affected, interstate commerce.

## THE PARTIES

### Plaintiff

14.    Plaintiff Cindy Cronin resides in Valley Center, California and purchased fenofibrate in California, one of the Indirect Purchaser States, during the Class Period.

### Defendants

15.    Defendant Abbott Laboratories ("Abbott") is a corporation organized, existing, and doing business under the laws of the state of Illinois. Its office and principal place of business is located at 100 Abbott Park Road, Abbott Park, Illinois 60064. Abbott is engaged principally in the development, manufacture, and sale of pharmaceuticals and health care products and services. Abbott had sales of $19.7 billion in 2004. Abbott operates in 130 countries and has facilities in 14 states.

16.    Defendants Fournier Industrie et Sante, (formerly known as Fournier Innovation et Synergic), and Laboratoires Fournier, S.A. (collectively "Fournier" and collectively with Abbott "Defendants"), are French corporations having their principal place of business at 42 Rue de Longvie, 21300 Chenove, France. Abbott is the licensee from Fournier of the five patents listed in the Orange Book for TriCor® products.

6

## RELEVANT MARKET

17.    The relevant product market in which to assess the anticompetitive effect of

Defendants' conduct is the market for fenofibrate products, which consists of TriCor® products

and generic bioequivalent versions of TriCor® products. Upon final approval from the FDA,

generic fenofibrate products will be reasonably interchangeable and have a strong cross-elasticity

of demand with TriCor® products.

18.    The relevant geographic market is the United States as a whole (for Counts I and

III) and the Indirect Purchaser States (for Count II).

19.    At all relevant times, Defendants' market share in the relevant product and

geographic markets was and is between 95% and 100%.

## FACTUAL ALLEGATIONS

### The Federal Scheme For Approval of Generic Drugs

20.    Under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, *et seq*., (the

"FFDCA"), approval by the FDA is required before a new drug (often referred to as a "pioneer

drug"), can be manufactured and sold in the United States. Approval for a new drug requires the

filing of a New Drug Application ("NDA") with the FDA demonstrating that the drug is safe and

effective for its intended use. New drugs that are approved for sale in the United States by the

FDA are often covered by patents and marketed under a brand name.

21.    Generic drugs are products that the FDA has found to have the same active

chemical composition and provide the same therapeutic effects as the corresponding pioneer,

brand-name drugs. If a generic drug is determined to be bioequivalent to a corresponding

7

pioneer or brand-name drug, the FDA assigns the generic drug an "AB" rating. According to the FDA, a bioequivalent generic drug rated "AB" may be used and substituted interchangeably with the referenced branded drug.

22.    Once the safety and efficacy of a new drug is approved by the FDA, that drug may be made available to customers in the United States only under the direction and care of a physician who writes a prescription specifying the drug by name, and only from a licensed pharmacist. The pharmacist must fill the prescription with the drug brand specified by the physician, unless an AB-rated generic version of that pioneer drug which has been approved by the FDA is available. Once a physician writes a prescription for a brand-name drug, such as TriCor® capsules, that prescription can be filled only with the drug named in the prescription or an AB-rated generic equivalent. Only generic drugs which carry the FDA's "AB" rating may be substituted by a pharmacist for the physician-prescribed brand-name drug.

23.    If an AB-rated generic formulation of a brand-name drug exists and the physician has not specifically indicated on the prescription "DAW" or "dispense as written" (or similar indications, the wording of which varies slightly from state to state), then: (a) for consumers covered by most prescription drug benefit plans, the pharmacist will substitute the generic drug; and (b) for consumers whose purchases are not covered by prescription drug benefit plans, the pharmacist will offer the consumer the choice of purchasing the AB-rated generic at a lower price.

24.    Generic drugs are invariably priced below the branded drugs to which they are bioequivalent. A 1998 study conducted by the Congressional Budget Office ("CBO") concludes that the purchase of generic drugs saved consumers and third party payors between $8-10 billion

8

in a single year. The study also concludes that the average price of brand-name drugs facing generic competition is less than the average price of brand-name drugs without generic competition.

25.    Similarly, an August, 2000 Government Accounting Office report observes: "Because generic drugs are not patented and can be copied by different manufacturers, they often face intense competition, which usually results in much lower prices than brand-name drugs."

26.    A branded drug loses a significant portion of its market share to generic competitors less than a year after the introduction of generic competition, even if the brand-name manufacturer lowers prices to meet competition. In testimony before Congress, a representative from the Pharmaceutical Research and Manufacturers of America (a brand-name pharmaceutical manufacturers' trade association), confirmed that "in most cases, sales of pioneer medicines drop as much as 75 percent within weeks after a generic copy enters the market."

**The Hatch-Waxman Act**

27.    In 1984, Congress enacted legislation, commonly known as the "Hatch-Waxman Act," to establish an abbreviated process to expedite and facilitate the development and approval of generic drugs. 21 U.S.C. § 355.

28.    The Hatch-Waxman Act (the "Act") permits a generic drug manufacturer to file an Abbreviated New Drug Application ("ANDA") that incorporates by reference the safety and efficacy data developed and previously submitted in the NDA process by the company that manufactured the pioneer drug.

29.    The FDA maintains and publishes *Approved Drug Products with Therapeutic Equivalence Evaluations* (commonly known as the "Orange Book"), which lists all prescription

9

drugs approved for use in the United States and the patents, if any, covering those drugs.

30.    With regard to patents listed in the Orange Book, an ANDA applicant must make one of four certifications in accordance with FFDCA Section 355(j)(2)(A)(vii):

    I.    that no patent for the pioneer drug has been filed with the FDA;

    II.    that the patent for the pioneer drug has expired;

    III.    that the patent for the pioneer drug will expire on a particular date and the generic company does not seek to market its generic product before that date (a "Paragraph III Certification"); or

    IV.    that the patent for the pioneer drug is invalid or will not be infringed upon by the generic company's proposed product (a "Paragraph IV Certification").

31.    If an ANDA includes a Paragraph IV Certification, the applicant must notify the pioneer drug patent owner of the certification.

32.    The Act then affords the pioneer drug patent owner 45 days after receipt of Paragraph IV Certification notification to initiate a patent infringement lawsuit against the ANDA applicant. If no lawsuit is initiated during this 45-day window, the process for FDA approval of the generic product continues.

33.    If a patent infringement suit is commenced within the 45-day window, FDA final approval of the ANDA is automatically stayed until the earliest of: (a) the expiration of the patent; (b) the expiration of 30 months from the patent holder's receipt of notice of the Paragraph IV Certification (the "30-month stay"); or (c) a final judicial determination of non-infringement or patent invalidity.

34.    The Act also provides the first filer of an ANDA with a Paragraph IV Certification with a 180-day period in which to market its generic version on an exclusive basis

10

(the "180-day exclusivity period").

35.     The 180-day exclusivity period is triggered by either: (a) commercial marketing of the generic product, or (b) a final court decision that the patent at issue is either invalid or not infringed.

36.     Prior to the expiration of the 30-month stay, the FDA may grant "tentative" approval of an ANDA once it determines that all the criteria for "final" approval have been satisfied.

37.     The Act expressly permits the FDA to grant final approval to the first filed ANDA, and an ANDA applicant with FDA approval may market its generic product in the United States while the patent infringement lawsuit remains unresolved.

38.     Thus, the practical result of the Act is that, if a patent is listed in the Orange Book, the pioneer drug patent holder need only file a patent infringement lawsuit within the 45-day window in order to block FDA approval of an ANDA applicant's generic drug from entering the market for up to 30 months.

39.     The Medicare Prescription Drug Improvement and Modernization Act of 2003, signed by President Bush on December 8, 2003, changed certain provisions of the Hatch-Waxman Act to curtail abuses by pharmaceutical manufacturers, such as precluding multiple 30-month stays.

## Fenofibrate Products

40.     Pharmaceutical products with the API fenofibrate reduce high levels of low-density lipoprotein cholesterol ("LDL-C"), sometimes referred to as "bad cholesterol," and triglycerides by promoting the dissolution and elimination of fat particles in the blood.

11

Fenofibrate products also increase levels of high-density lipoprotein cholesterol ("HDL-C"), sometimes referred to as "good cholesterol," and reduce LDL-C in patients with primary hypercholesterolemia (high bad cholesterol) or mixed dyslipidemia (high bad cholesterol and high triglycerides). Fenofibrate products are also effective at reducing triglycerides in patients with hypertriglyceridemia (high triglycerides).

41.    On February 9, 1998, Abbott received final approval for NDA No. 019304 for 67 mg fenofibrate capsules. On June 30, 1999, Abbott received final approval for 134 mg and 200 mg fenofibrate capsules. In connection with fenofibrate capsules, Abbott submitted to the FDA for listing in the Orange Book Patent No. 4,984,726 (the "'726 patent"), which was granted on January 23, 1990 to Fournier and exclusively licensed to Abbott in 1997.

## Generic Manufacturers Apply To Market Fenofibrate Products

42.    On December 14, 1999, Novopharm Ltd. filed an ANDA for 67 mg fenofibrate capsules (the "Capsule ANDA"). Novopharm sought approval to market its fenofibrate capsule product prior to the expiration of the '726 patent. Novopharm certified that its product did not infringe the '726 patent, and duly and timely notified Abbott of its ANDA. The ANDA was amended on March 31, 2000 and November 27, 2000 to include the 134 mg and 200 mg strength capsules. In April 2000, Novopharm was acquired by Teva Pharmaceutical Industries, Ltd. ("Teva").

43.    Other generic manufacturers subsequently sought to market fenofibrate capsules, including Impax Laboratories, Inc. (ANDA filed May 9, 2000) and Reliant Pharms Inc. (NDA filed December 1, 2003).

44.    On April 7, 2000, Defendants sued Novopharm and Teva in the United States

12

District Court for the Northern District of Illinois for infringement of the '726 patent based on Novopharm's Capsule ANDA for 67 mg and 200 mg fenofibrate capsules. Abbott's and Fournier's lawsuit triggered the automatic 30-month stay under the Hatch-Waxman Act, preventing the FDA from granting final approval to Novopharm's Capsule ANDA. Abbott and Fournier also sued Impax in the Northern District of Illinois, giving rise to a 30-month stay.

## Defendants' First Market Switch: Capsules to Tablets

45.     Along with its NDA for fenofibrate capsules, Abbott also held NDA No. 021203 for 54 mg and 160 mg fenofibrate tablets, which the FDA approved on September 4, 2001. Abbott and, through its licensing agreement, Fournier, thereafter sold 54 mg and 160 mg fenofibrate tablets in the United States under the brand name TriCor®. Abbott's sales of TriCor® tablets have since accounted for over 95% of all sales of fenofibrate products, and 100% of all fenofibrate tablet sales, in the United States. For the twelve months ending September 2004, these products had sales in the United States in excess of $750 million.

46.     After the FDA approved Abbott's NDA for fenofibrate tablets, Abbott and Fournier took affirmative steps to destroy the market for generic fenofibrate capsules. Abbott and Fournier removed the fenofibrate capsule code from the National Drug Data File® ("NDDF"), and they removed (or "obsoleted") TriCor® brand fenofibrate capsules from the market.

47.     The NDDF is a widely accepted database provided by First Databank, Inc. that includes drug descriptions and pricing information with an extensive array of clinical decision-support modules. This electronic drug information encompasses every drug approved by the FDA, including generic alternatives, and is used throughout the healthcare industry. The NDDF

listing is crucial because the pharmacist filling a prescription written for TriCor® capsules is advised by a code reference in the database that a lower cost generic version of the drug is available. In most cases, a pharmacist will then fill that prescription with the generic version, unless the prescription specifically states otherwise. By removing TriCor® capsules from the NDDF, the branded drug code reference no longer exists for purposes of generic substitution laws or for purposes of health care providers' pharmaceutical benefit programs.

48.     When Defendants removed their fenofibrate capsules from the market, they also changed Abbott's sales force and stopped detailing the capsule formulation in the market. By removing the capsule code from the NDDF, Abbott and Fournier rendered the TriCor® capsule code, to which Teva's capsules would have been compared, obsolete.

### Teva's Pyrrhic Victory on Fenofibrate Capsules – Approval For a Product That Could No Longer Be Marketed as a Generic

49.     On March 19, 2002, the Illinois court granted Teva's motion for summary judgment of non-infringement of the '726 patent, clearing the way for Teva to market its fenofibrate capsule product. On March 26, 2003, the Illinois court granted Impax's motion for summary judgment of non-infringement as well.

50.     On April 9, 2002, as a result of the non-infringement decision, Teva received final FDA approval to market its 134 mg and 200 mg fenofibrate capsule products, and tentative FDA approval to market its 67 mg fenofibrate capsule products. Teva began to sell its 134 mg and 200 mg fenofibrate capsule products in April 2002. As the first filer of a capsule ANDA with a Paragraph IV certification, Teva was granted a six-month exclusivity period during which the FDA would not grant final approval to another fenofibrate capsule ANDA. During an

14

exclusivity period for a blockbuster drug such as TriCor® capsules, Teva could reasonably expect to make well more than $100 million in sales at prices substantially less than the price for branded TriCor® capsules.

51.    However, Defendants' anticompetitive tactics rendered a Pyrrhic victory Teva's favorable decision and award of an otherwise valuable exclusivity period. Defendants' removal of TriCor® capsules from the NDDF meant that there was no longer a brand reference drug for Teva's fenofibrate capsules. Abbott's and Fournier's only purpose in removing the capsule code from the NDDF was to foreclose generic competition from Teva and other generic manufacturers in the fenofibrate product market. Had the capsule code been maintained in the NDDF, there would still have been a reference for which Teva's generic capsules could have been substituted. Without Abbott's and Fournier's branded TriCor® capsule code as a reference, however, and without the continuation of Abbott's capsules in the marketplace, there was no longer a market for generic fenofibrate capsule products. Accordingly, most of the fenofibrate capsules that Teva had shipped to its customers were returned. Teva was effectively blocked from the market as a generic competitor in the fenofibrate market.

52.    On October 7, 2002, the statutory 30-month stay on FDA approval of Teva's Capsule ANDA for 67 mg fenofibrate capsules ended, allowing Teva to enter the then-defunct capsule market with that dosage. On October 23, 2003, Impax was granted final approval to market its fenofibrate capsule products.

## Teva Files ANDA to Market Fenofibrate Tablets

53.    Blocked from the fenofibate capsule market, Teva next sought to market generic fenofibrate tablets. On June 17, 2002, Teva filed with the FDA an ANDA for its generic

15

fenofibrate 54 mg and 160 mg tablets (the "Tablet ANDA"). In connection with its Tablet ANDA, Teva submitted a Paragraph IV certification that the ANDA did not infringe the '726 Patent, as well as two additional patents, U.S. Patent No. 6,074,670 (the "670 Patent") and U.S. Patent No. 6,277,405 (the "405 Patent"). On August 21, 2002, Teva notified Defendants of the filing of the Tablet ANDA and the concomitant Paragraph IV.

54.    In response, Defendants filed patent infringement action Civil Action No. 02-1512, which asserts that Teva's Tablet ANDA infringes the '726 Patent, the '670 Patent, and the '405 Patent. Defendants' action triggered an automatic 30-month stay under the Hatch-Waxman Act that prevents the FDA from granting final approval to Teva's Tablet ANDA as long as the statutory stay remains in effect.

55.    On July 23, 2003, Defendants listed U.S. Patent No. 6,589,552 (the "552 Patent") in the Orange Book for TriCor® 54 mg and 160 mg tablets.

56.    By July 29, 2003, Teva had supplemented its Tablet ANDA by filing a Paragraph IV certification to the '552 Patent. By July 29, 2003 Teva gave notice to Defendants of the filing of its Paragraph IV certification to the '552 Patent.

57.    In response to Teva's Paragraph IV certification to the '552 Patent, Defendants filed patent infringement action Civil Action No. 03-847 on August 29, 2003, alleging that Teva's Tablet ANDA infringes the '552 Patent. Defendants' action triggered *another* 30-month automatic stay period under the Hatch-Waxman Act. This successive 30-month stay commenced before the December 2003 amendments to the Hatch-Waxman Act and, absent a court decision, will continue in effect more than one year after the first 30-month stay that went into effect with the filing of the first action, C.A. No. 02-1512.

16

## Defendants Submit NDA for New Tablet Formulations

58.    On October 29, 2003, Defendants submitted NDA No. 021656 to the FDA for their new version of TriCor® fenofibrate tablets in 48 mg and 145 mg dosage forms. Defendants did not seek FDA approval for this new formulation product until after they knew that Teva had developed generic fenofibrate tablets and was seeking approval to sell those tablets in the United States.

59.    On December 12, 2003, Defendants listed U.S. Patent No. 6,0652,881 (the "881 Patent") in the Orange Book for TriCor® 54 mg and 160 mg tablets.

60.    On December 17, 2003, Teva supplemented its Tablet ANDA by filing a Paragraph IV certification regarding the '881 Patent and notified Defendants of the certification.

61.    Defendants responded by filing patent infringement action Civil Action No. 04-0047 on January 22, 2004, which alleges that Teva's Tablet ANDA infringes the '881 Patent. Fortunately, because of the December 2003 amendments to the Hatch-Waxman Act, another 30-month stay was not available.

## Teva Granted Tentative Approval For 54 mg and 160 mg Fenofibrate Tablets

62.    On March 5, 2004, the FDA granted tentative approval to Teva's Tablet ANDA. By granting tentative approval, the FDA indicated that Teva's fenofibrate 54 mg and 160 mg tablets are bioequivalent to TriCor® tablets of the same dosage strengths. However, due to the successive 30-month stays resulting automatically from Defendants' filing and maintenance of their patent infringement actions against Teva concerning Teva's Tablet ANDA, the FDA was legally precluded from granting final approval to Teva's Tablet ANDA until the stays expire or a court enters judgment in Teva's favor.

Defendants' Second Market Switch

63.    On November 5, 2004, Abbott announced that it had received FDA approval to market the 48 mg and 145 mg TriCor® fenofibrate tablets. The new version tablets replace Abbott's 54 mg and 160 mg tablet dosage forms and are indicated for the exact same uses as the 54 mg and 160 mg tablet dosage forms.

64.    Defendants are marketing their new 48 mg and 145 mg TriCor® tablet products, and have ceased supplying the market with the 54 mg and 160 mg TriCor® tablets. The supply of Defendants' 54 mg and 160 mg TriCor® tablets soon disappeared and Defendants removed the brand reference code from the NDDF.

65.    On May 16, 2005, after the 30-month stay expired, Teva announced that the FDA granted final approval for their Tablet ANDA for 54 mg and 160 mg fenofibrate tablets. That same day, Defendants informed the judge presiding over the patent infringement actions that "they no longer wish to prosecute their consolidated patent infringement action against Teva and Impax." Defendants, having effectively delayed generic competition through the filing of their patent infringement litigation, no longer found the prosecution of such claims desirable.

The Effects of Defendants' Anti-Competitive Conduct
on the United States Market for Fenofribrate Products

66.    The purpose of Defendants' anti-competitive conduct is to obtain and maintain monopoly power in the market for fenofibrate products and their generic bioequivalents. But for the anticompetitive actions alleged herein, generic versions of TriCor® capsules would have been available to consumers in April 2002. When Teva launched its fenofibrate capsules in

18

April 2002, however, no branded reference was available because Abbott had taken the unprecedented step of removing its brand reference code from the NDDF.

67.    Removing TriCor® capsules from the NDDF eliminated the branded drug code reference for purposes of generic substitution laws or health care providers' pharmaceutical benefit programs. Thus, had Abbott not withdrawn TriCor® capsules from the NDDF, a pharmacist filling a prescription written for TriCor® capsules after April 2002 would have been advised by a code reference in the database that a lower cost generic version of the drug was available. That pharmacist could have substituted, and often would have been required to substitute, the generic version in filling the prescription. Similarly, prescription benefit plans that provide for tiered co-payment arrangement are designed to steer consumers to lower cost generic drugs by requiring higher co-payments for branded drugs, *e.g.*, a branded co-payment might be $25, but only $10 for the generic version of the same drug. These incentives result in a brand name drug quickly losing a significant portion of its market share soon after the introduction of generic competition, even if the brand name manufacturer lowers its price to meet competition. This is the very generic competition that Congress sought to facilitate when it adopted the Hatch-Waxman Act in 1984.

68.    Defendants herein have gamed the system to undermine the purposes of the Hatch-Waxman Act and preclude consumer access to lower-cost generic fenofibrate products. Their conduct has assured that prescriptions for TriCor® capsules cannot be filled by the pharmacist at all, not even with a bioequivalent substitute marketed by Teva. Similarly, an insured consumer attempting to fill a prescription for TriCor® capsules will not be able to do so, and will not have the option of substituting a generic version for a lower co-payment.

19

69.    Because the code reference for TriCor® capsules does not exist, Teva could not sell its fenofibrate capsules as a generic drug. In fact, most of the fenofibrate capsules that Teva shipped after the launch in 2002 were subsequently returned by customers because they could not be sold. Teva was forced to market its fenofribate capsules as a branded product (under the trade name Lofibra®) without the benefits of a generic classification for purposes of generic substitution laws or lower prescription benefit co-payments. Teva, like most generic manufacturers, does not employ an extensive marketing department like brand-name manufacturers and Lofibra® sales have been negligible (in the range of about $4 million per year), barely scratching the surface of Defendants' fenofibrate monopoly. Other generic manufacturers have received FDA final approval to market fenofibrate capsules (Impax Labs on October 27, 2003 and Reliant Pharms on November 30, 2004), but they face the same barriers as Teva in penetrating Defendants' unlawfully protected monopoly.

70.    By foreclosing the ability of generic manufacturers to market generic products, Defendants' anticompetitive acts imposed significant barriers to market entry on its would-be generic competitors and allowed Defendants to maintain supracompetitive prices for their fenofibrate products.

71.    Defendants repeated this maneuver with the market shift to new tablet formulations, ensuring that even if prescriptions for the 54 mg and 160 mg tablet formulations are written, no generic substitutions will be allowed. Defendants have ceased distribution of their 54 mg and 160 mg tablet formulations to the market and removed the reference code in the NDDF for their 54 mg and 160 mg tablet formulations. Without this reference code, it is illegal for a pharmacist to substitute a generic alternative of the 54 mg and 160 mg formulations for any

20

prescription for the 54 mg and 160 mg tablet formulations.

72.    Defendants' removal of the reference code in the NDDF for its 54 mg and 160 mg tablet formulations also will make it more expensive for any patients to use Teva's fenofibrate tablets in the event that a physician writes a prescription for 54 mg and/or 160 mg fenofibrate formulations. Patients will be forced to pay higher co-payment amounts for Teva's 54 mg or 160 mg fenofibrates tablets when there is no reference code for Abbott's and Fournier's TriCor® 54 mg or 160 mg tablets in the NDDF than they would be required to pay for generic manufacturers' product if Abbott and Fournier maintained the reference in the NDDF. This is because, without a reference code in the NDDF for TriCor® 54 mg or 160 mg tablets, generic manufacturers' tablets will be treated as branded product rather than a generic product if listed in the NDDF, which would lead prescription benefit providers to require higher co-payments.

73. ·    Consumers attempting to purchase a fenofibrate product will be made financially aware of Defendants' scheme. For example, online retailer Drugstore.com sells most branded and generic drugs, and encourages generic substitution with immediate price comparisons. Drugstore.com describes the general difference between generic and brand medications on their website:

### Generic vs. Brand Medications

Generic medicines are approved for use by the Food and Drug Administration (FDA) and are therapeutically equivalent to brand name products. In almost all cases, generics work just as well as their brand-name siblings and often cost considerably less.

Most states allow pharmacists to substitute a generic when appropriate and when you and your doctor authorize it. Our pharmacy is located in New Jersey, so we substitute generic drugs recognized as interchangeable under New Jersey law. If you and your doctor have authorized the use of generic medicines, our pharmacy

21

will substitute your prescription with the generic equivalent.

http://www.drugstore.com/cat/10661/tmpl/default.asp?catid=15610&trx=9885&trxp1=15610&tr
xp2=topic&trxp3=15574 (last visited July 11, 2005).

74.    An inquiry on Drugstore.com for a branded drug with an available generic
version, such as Cipro®, indicates that the 500 mg formulation of brand-name Cipro® costs
$148.99 and $433.97 for the 30 tablet and 90 tablet amounts, respectively.  Generic ciproflaxin
in the same dosage and tablet amounts costs only $121.71 and $360.64, respectively.  Source:
http://www.drugstore.com/pharmacy/prices/drugprice.asp?ndc=00026851351&trx= 1Z5006 (last
visited July 11, 2005).

75.    Significantly, an inquiry on Drugstore.com for "tricor" reveals pricing only exists
for the branded drug.  For example, the 48 mg formulation in 30 tablet and 90 tablet amounts
costs $35.32 and $98.68, respectively, and the 145 mg formulation in 30 tablet and 90 tablet
amounts costs $ 93.50 and $264.91, respectively.  Source: http://www.drugstore.com/
pharmacy/drugindex/rxsearch.asp?search=tricor (last visited July 11, 2005).  There is no
reference to TriCor® capsules (which no longer exist), TriCor® tablets in 54 mg, 67 mg or 160
mg strength (since Abbott has already cut off the supply), generic versions of those products, or
Lofibra® capsules, which is not a generic bioequivalent to the tablets.

76.    An inquiry for "fenofibrate" will also bring up a reference to Lofibra® capsules as
a branded drug without a generic alternative, priced for the 67 mg formulations in the 30 tablet
and 90 tablet amounts as $26.24 and $69.29, respectively; for the 134 mg formulations in the 30
tablet and 90 tablet amounts as $48.29 and $133.34, respectively; and for the 200 mg
formulations in the 30 tablet and 90 tablet amounts as $73.49 and $205.79, respectively.  Source:

22

http://www.drugstore.com/pharmacy/drugindex/rxsearch.asp?search=fenofibrate (last visited July 11, 2005).

77.   As a result of Defendants' anti-competitive conduct, Plaintiff and the Class have been financially injured.  First, Plaintiff and the Class have never had the opportunity to realize savings for lower-cost generic versions of fenofibrate products.  Second, while Defendants have maintained their monopoly for fenofibrate products and generic equivalents, Plaintiff and the Class have paid and reimbursed supra-competitive and artificially high prices for TriCor® products.

78.   Defendants had and have no legitimate justification, economic or otherwise, for committing the violations of law alleged herein.  Abbott's and Fournier's conduct in ending sales of certain strengths or formulations of their TriCor® tablets and their TriCor® capsules is purely private conduct.  Removing a product reference from the NDDF does not involve any governmental petitioning activity.

## CLASS ALLEGATIONS

79.   Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, sub-sections 23(a) and 23(b)(2) and/or (b)(3), on behalf of a class defined as follows:

> All persons or entities in the United States and its territories who purchased, paid and/or reimbursed for fenofibrate products, including TriCor® tablets and TriCor® capsules, intended for consumption by themselves, their families, or their members, employees or insureds (the "Class") during the period from April 9, 2002 through such time in the future as the effects of Defendants' illegal conduct, as alleged herein, have ceased (the "Class Period").  Excluded from the Class are all Defendants and their respective subsidiaries and affiliates, all governmental entities, and all persons or entities that purchased fenofibrate products: (i) for purposes of resale, or (ii) directly from any of the Defendants.

Count II applies to purchases of fenofibrate products in the Indirect Purchaser States.

23

80.    The members of the Class are so numerous that joinder of all members is impracticable. Purchasers of fenofibrate products during the Class Period number in the millions nationally, and there are, at a minimum, thousands of fenofibrate purchasers in each state.

81.    Defendants' unlawful, anti-competitive and inequitable methods, acts and trade practices have targeted and affected all members of the Class in a similar manner, *i.e.*, they have been overpaying for fenofibrate products due to the absence of competing generic versions of TriCor® tablets and TriCor® capsules in the marketplace, and will continue to pay supra-competitive prices so long as Defendants' scheme continues. Among the questions of law and fact common to the Class are:

(a)    whether Defendants' conduct as alleged violates federal and state antitrust and/or consumer protection laws;

(b)    whether Defendants have monopolized and attempted to monopolize the market for fenofibrate products;

(c)    whether Defendants intentionally and unlawfully excluded competitors and potential competitors from the market for fenofibrate products and generic bio-equivalents of TriCor® formulations;

(d)    whether Plaintiff and members of the Class are entitled to equitable and/or injunctive relief;

(e)    the amount of the overcharges or amounts paid or reimbursed by members of the Class for fenofibrate products over and above the amounts they would have paid or reimbursed in a competitive market unaffected by Defendants' illegal acts as alleged herein; and

(f)    whether Defendants unjustly enriched themselves to the detriment of Plaintiff and the Class, entitling Plaintiff and the Class to disgorgement of all monies resulting therefrom.

82.    Plaintiff's claims are typical of those of the Class she represents because Plaintiff and all of the Class members were injured and continue to be injured and/or threatened with

24

injury in the same manner by Defendants' unlawful, anti-competitive and inequitable methods, acts and practices, *i.e.*, they have paid and continue to pay supra-competitive prices for fenofibrate products and will continue to be forced to do so until the relevant market is truly competitive and prices have stabilized to competitive levels.

83.    Plaintiff will fully and adequately protect the interests of all members of the Class. Plaintiff has retained counsel who are experienced in antitrust and consumer class action litigation. Plaintiff has no interests which are adverse to, or in conflict with, other members of the Class.

84.    The questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members.

85.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty likely to be encountered in the management of this action that would preclude its maintenance as a class action.

86.    In addition, Defendants have acted and refused to act, as alleged herein, on grounds generally applicable to the Class.

## COUNT I
### (INJUNCTIVE RELIEF UNDER § 16 OF THE CLAYTON ACT FOR VIOLATIONS OF § 2 OF THE SHERMAN ACT)

87.    Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

88.    As alleged above, Defendants knowingly and willfully engaged in a course of conduct designated to unlawfully maintain and prolong their monopoly position in the market for fenofibrate products in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.

25

89.    Plaintiff and the other members of the Class have been injured in their business or property by reason of Defendants' antitrust violation alleged in this Count. Their injury consists of being deprived of the ability to purchase less expensive, generic fenofibrate products, and paying higher prices for TriCor® products than they would have paid in the absence of the antitrust violation. The injury to Plaintiff and the Class is the type of injury that antitrust laws were designed to prevent, and the injury flows from Defendants' unlawful conduct. Plaintiff and members of the Class are threatened with further injuries as a result of Defendants' continuing scheme, as alleged herein.

90.    Plaintiff and the Class seek equitable and injunctive relief pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anti-competitive market effects caused by the unlawful conduct of Defendants, and other relief so as to assure that similar anti-competitive conduct does not occur in the future.

## COUNT II
## (FOR COMPENSATORY AND MULTIPLE DAMAGES UNDER THE ANTITRUST AND/OR CONSUMER PROTECTION STATUTES OF THE INDIRECT PURCHASER STATES)

91.    Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

92.    Defendants' conduct alleged herein constitutes unlawful acts of monopolization and attempts to monopolize, as well as prohibited practices and unconscionable conduct under the antitrust and/or unfair and deceptive trade practices acts of the Indirect Purchaser States, as follows:

a.    Arizona: The aforementioned practices by Defendants were and are in

26

violation of the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. §§ 44-1401, *et seq.*, the

Arizona Consumer Fraud Act, Ariz. Rev. Stat §§ 44-1521, *et seq.*, and the Constitution of the

State of Arizona, Article 14, §15;

      b.    California:  The aforementioned practices by Defendants were and are in

violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.*, and the California

Unfair Competition Act, Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

      c.    District of Columbia:  The aforementioned practices by Defendants were

and are in violation of the District of Columbia Antitrust Act, D.C. Code §§ 28-4501, *et seq.*;

      d.    Florida:  The aforementioned practices by Defendants were and are in

violation of the Florida Antitrust Act, Fla. Stat. Ann. §§ 542.15, *et seq.*, and the Florida

Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. §§ 501.201, *et seq.*;

      e.    Iowa:  The aforementioned practices by Defendants were and are in

violation of the Iowa Competition Law, Iowa Code §§ 553.4, 553.5 (1997);

      f.    Kansas:  The aforementioned practices by Defendants were and are in

violation of the Kansas Monopolies and Unfair Trade Act, Kan. Stat. Ann. §§ 50-101, *et seq.*,

and the Kansas Consumer Protection Act, Kan. Stat. Ann §§ 50-623, *et seq.*;

      g.    Louisiana:  The aforementioned practices by Defendants were and are in

violation of the Louisiana Monopolies Law, La. Rev. Stat. Ann. §§ 51:121, *et seq.,* and the

Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. §§ 51:1401,

*et seq.*;

      h.    Maine:  The aforementioned practices by Defendants were and are in

violation of the Maine Monopolies and Profiteering Statute, Me. Rev. Stat. Ann. tit. 10, §§ 1101,

*et seq.*, and the Maine Unfair Trade Practices Act, Me. Rev. Stat. Ann. tit. 5, §§ 205-A, *et seq.*;

      i.     <u>Massachusetts</u>: The aforementioned practices by Defendants were and are in violation of the Massachusetts Antitrust Act, Mass. Gen. Laws, ch. 93, and the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A;

      j.     <u>Michigan</u>: The aforementioned practices by Defendants were and are in violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws §§445.771, *et seq.*, and the Michigan Consumer Protection Act, §§ 445.901, *et seq.*;

      k.     <u>Minnesota</u>: The aforementioned practices by Defendants were and are in violation of the Minnesota Antitrust Law of 1971, Minn. Stat. §§ 325D.49, *et seq.*, and the Minnesota Consumer Fraud Act, Minn. Stat §§ 325F.67, *et seq.*;

      l.     <u>Mississippi</u>: The aforementioned practices by Defendants were and are in violation of Miss. Code Ann. §§ 75-21-1, *et seq.*;

      m.     <u>Nebraska</u>: The aforementioned practices by Defendants were and are in violation of Ne. Rev. Stat. §§ 59-801, *et seq.*;

      n.     <u>Nevada</u>: The aforementioned practices by Defendants were and are in violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. §§ 598A.010, *et seq.*, and the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §§ 598.0903, *et seq.*;

      o.     <u>New Jersey</u>: The aforementioned practices by Defendants were and are in violation of the New Jersey Antitrust Act, N.J. Stat. Ann. §§ 56:9-1, *et seq.*, and the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1, *et seq.*;

      p.     <u>New Mexico</u>: The aforementioned practices by Defendants were and are in violation of the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1, *et seq.*, and the New

28

Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1, *et seq.*;

q.    New York: The aforementioned practices by Defendants were and are in violation of the Donnelly Act, N.Y. Gen. Bus. Law §§ 340, *et seq.*, and the New York Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law §§ 349, *et seq.*;

r.    North Carolina: The aforementioned practices by Defendants were and are in violation of North Carolina's antitrust and unfair competition law, N.C. Gen. Stat. §§ 75-1, *et seq.*;

s.    North Dakota: The aforementioned practices by Defendants were and are in violation of the North Dakota Antitrust Act, N.D. Cent. Code §§ 51-08.1-01, *et seq.*, and the North Dakota Consumer Fraud Act, N.D. Cent. Code §§ 51-15-01, *et seq.*;

t.    South Dakota: The aforementioned practices of Defendants were and are in violation of South Dakota's antitrust law, S.D. Codified Laws §§ 37-1-3, *et seq.*, and deceptive trade practices and consumer protection law, S.D. Codified Laws §§ 37-24-1, *et seq.*;

u.    Tennessee: The aforementioned practices of Defendants were and are in violation the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101, *et seq.*, and the Consumer Protection Act, Tenn. Code Ann. §§ 47-18-101, *et seq.*;

v.    Vermont: The aforementioned practices of Defendants were and are in violation of the Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9, §§ 2451, *et seq.*;

w.    West Virginia: The aforementioned practices by Defendants were and are in violation of the West Virginia Antitrust Act, W.Va. Code §§ 47-18-1, *et seq.*, and the West Virginia Consumer Credit and Protection Act, W. Va. Code §§ 46A-6-101, *et seq.*; and

x.    Wisconsin: The aforementioned practices by Defendants were and are in

29

violation of the Wisconsin Antitrust Act, Wis. Stat. §§ 133.01, *et seq.*, and the Wisconsin Unfair

Trade Practices Act, Wis. Stat. §§ 100.20, *et seq.*

93.    As a result of Defendants' unlawful conduct, Plaintiff and the Class have

sustained and will continue to sustain substantial losses and damage to their businesses and

property in the form of, *inter alia*, being deprived of the ability to purchase less expensive,

generic versions of TriCor®, and paying prices for fenofibrate products that were higher than

they would have been but for Defendants' improper actions.  The full amount of such damages is

presently unknown and will be determined after discovery and upon proof at trial.

94.    Plaintiff and the Class seek compensatory and multiple damages, and other

damages as permitted by state law, for their injuries caused by these violations pursuant to these

statutes.

## COUNT III

### (FOR RESTITUTION, DISGORGEMENT AND CONSTRUCTIVE TRUST FOR UNJUST ENRICHMENT TO DEFENDANTS)

95.    Plaintiff repeats and realleges the preceding and subsequent paragraphs as though

set forth herein.

96.    As a result of their unlawful conduct described above, Defendants have been and

will continue to be unjustly enriched.  Defendants' unlawful acts include, for the reasons alleged

above, improperly withdrawing the reference code in the NDDF for TriCor® capsules in order to

impose barriers to entry for generic manufacturers seeking to compete in the Relevant Market.

Defendants have been unjustly enriched, to the detriment of Plaintiff and the Class, by the receipt

of, at a minimum, unlawfully inflated prices and illegal monopoly profits on their sale of

30

TriCor® products. Defendants have benefitted from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of their ill-gotten gains resulting from the overpayments for TriCor® products made by Plaintiff and the Class.

97.     Plaintiff and members of the Class are entitled to the amount of Defendants' ill-gotten gains resulting from Defendants' unlawful, unjust and inequitable conduct. Plaintiff and the Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiff and the Class members may make claims on a *pro rata* basis.

**WHEREFORE**, Plaintiff prays that:

(a)     this Court determine that this action may be maintained as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure with respect to Plaintiff's claims for declaratory, equitable and injunctive relief, and Rule 23(b)(3) of the Federal Rules of Civil Procedure with respect to the claims for damages; and declare Plaintiff as representative of the Class;

(b)     the conduct alleged herein be declared, adjudged and decreed to be in violation of Section 2 of the Sherman Act, of the statutes of the Indirect Purchaser States set forth above, and the common law of unjust enrichment;

(c)     Plaintiff and each member of the Class be awarded damages and, where applicable, treble, multiple, and other damages, according to the laws of the Indirect Purchaser States, including interest;

(d)     Plaintiff and each member of the Class recover the amounts by which Defendants have been unjustly enriched;

(e)     Defendants be enjoined from continuing the illegal activities alleged

31

herein;

(f)    Plaintiff and the Class recover their costs of suit, including reasonable

attorneys' fees and expenses as provided by law;

(g)    Plaintiff and the Class be granted such other and further as the Court

deems just and necessary.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury of all issues so triable in this case.

Dated: July 11, 2005                    CHIMICLES & TIKELLIS LLP

By: _A-Zachary Naylor_

Pamela S. Tikellis (#2172)
Robert J. Kriner, Jr. (#2546)
A. Zachary Naylor (#4439)
Robert R. Davis (#4536)
P.O. Box 1035
One Rodney Square
Wilmington, DE 19899
Tel: 302-656-2500
Fax: 302-656-9053


FINKELSTEIN, THOMPSON & LOUGHRAN
L. Kendall Satterfield
Richard M. Volin
Karen J. Marcus
1050 30th Street, NW
Washington, DC 20007
Telephone: (202) 337-8000
Facsimile: (202) 337-8090

KRAUSE, KALFAYAN, BENINK & SLAVINS
Ralph B. Kalfayan
1010 Second Avenue, Suite 1750
San Diego, CA 92101-4906

32

Telephone: (619) 232-0331
Facsimile:  (619) 232-4019

**CHIMICLES & TIKELLIS LLP**
Michael D. Gottsch
Daniel B. Scott
361 West Lancaster Avenue
Haverford, PA  19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CINDY CRONIN, on behalf of herself and all others similarly situated, | Civil Action No. |
| Plaintiff, | |
| v. | |
| ABBOTT LABORATORIES, FOURNIER INDUSTRIE ET SANTE, and LABORATOIRES FOURNIER, S.A., | JURY TRIAL DEMANDED |
| | CLASS ACTION COMPLAINT |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Cindy Cronin ("Cronin"), individually and on behalf of all others similarly

situated, for her complaint against defendants Abbott Laboratories ("Abbott"), Fournier Industrie

et Sante, and Laboratoires Fournier, S.A. (collectively "Fournier" and collectively with Abbott

"Defendants"), upon knowledge as to herself and her own acts, and upon information and belief

as to all other matters, alleges as follows:

## NATURE OF THE ACTION

1.      This class action is brought under the federal antitrust laws and the antitrust

and/or deceptive practice statutes of the below-listed indirect purchaser states to remedy anti-

competitive actions by Defendants to foreclose generic competition for cholesterol-lowering

drugs that contain the active pharmaceutical ingredient ("API") fenofibrate. Abbott and Fournier

market, and have marketed, fenofibrate products under the brand-name TriCor®. In the past

1

year alone, Abbott and Fournier total sales of TriCor® products exceeded $750 million.

2.    Abbott and Fournier have implemented and are pursuing a scheme to unlawfully maintain and prolong their monopoly position in the market for fenofibrate products. This scheme abuses aspects of the complex health care delivery system and regulatory environment to deprive doctors and consumers of an opportunity to choose generic versions of fenofibrate formulations. The scheme delays or prevents entry into the relevant market of manufacturers with competing generic fenofibrate formulations by shifting the market to "new and improved" formulations that are altered only to avoid bioequivalence with the earlier formulations, and then withdrawing their initial formulations from healthcare databases. The withdrawal of initial formulations from healthcare databases is unnecessary to market Defendants' "new and improved" formulations, and has the purpose and effect of erecting substantial barriers to entry on would-be generic competitors by ensuring that once a generic company is able to launch a competitive fenofibrate product, it will have to do so without the benefits of generic classification that would have been available but for the scheme. Because the old formulation branded product no longer exists, the new competitive product: (i) cannot be marketed as a generic; and (ii) cannot be substituted for Abbott's and Fournier's next generation TriCor® products.

3.    Abbott's and Fournier's unlawful and anticompetitive scheme to thwart generic entry of fenofibrate products includes the following:

        (a)    Abbott and Fournier bring a TriCor® product formulation to market;

        (b)    Faced with the prospect of generic competitors bringing to market lower-cost bioequivalent generic versions of that TriCor® formulation, Abbott and Fournier engage in

2

a range of practices which have the purpose and effect of delaying the launch of competitive

generic formulations until after Defendants launch a "new" TriCor® formulation;

        (c)     Defendants reap monopoly profits by charging supracompetitive prices

during the exercise of their delay tactics, which block competitive generic drug rivals from the

fenofibrate market. These prices are far higher than the prices generic competitors would charge

if they were able to sell their bioequivalent versions of TriCor® products;

        (d)     Once market entry by competitive generic drug products appears

imminent, Abbott and Fournier begin selling a "new" formulation of a TriCor® product. This

"new" formulation is the same medicine as the existing formulation and has the same

indications; Defendants merely alter the delivery mechanism (i.e. capsule or tablet form) and the

milligram quantity.

        (e)     Abbott and Fournier take affirmative steps to convert customers from the

existing formulation to the new formulation before the competitive generic products are available

for sale;

        (f)     Despite Abbott's and Fournier's efforts at customer conversion, not all

patients or doctors switch from the old formulation to the new formulation. Thus, Abbott and

Fournier take additional steps to eliminate the generic market for the old formulation, as well as

customer choice: In 2002, Abbott and Fournier removed its brand reference for TriCor®

capsules from the National Drug Data File® ("NDDF"). As a result, the branded drug code

reference no longer exists for purposes of generic substitution laws or health care providers'

pharmaceutical benefit programs. Defendants stand poised to repeat this maneuver with its

market shift to new tablet formulations.

3

4.    As a result of this scheme, once a generic manufacturer is able to start selling a product that is bioequivalent to the old TriCor® formulation - and therefore could be substituted by a pharmacist for the old product — the market for that product has been switched to the new product. Because the would-be generic formulation is bioequivalent only to the old brand formulation, pharmacists and others cannot legally substitute the product for the new TriCor® product, even though the products are indicated for the same uses. The product switch and the withdrawal of the NDDF code effectively eliminates generic competition which otherwise would have arisen.

5.    Defendants' conduct unreasonably restrains competition. If Abbott and Fournier simply launched their new products, consumers would benefit from the existence of competition in sales of fenofibrate products. Instead, because Abbott and Fournier have improperly staved off generic competition and could potentially continue to do so indefinitely, Plaintiff and members of the Class have been forced to pay supracompetitive prices for, and are deprived of choices among, fenofibrate products.

6.    This class action is brought on behalf of all persons or entities that purchased or paid for fenofibrate products, including TriCor® products, since April 9, 2002.

7.    Plaintiff seeks on behalf of herself and the Class to enjoin, pursuant to §16 of the Clayton Act, 15 U.S.C. § 26, Defendants from continuing their unlawful monopolistic practices in violation of §2 of the Sherman Act, 15 U.S.C. §2. Plaintiff and the Class do not seek relief under §4 of the Clayton Act, 15 U.S.C. § 15.

8.    Plaintiff also seeks on behalf of herself and the Class damages for Defendants' violations of the antitrust and/or deceptive practice statutes of Arizona, California, District of

4

Columbia, Florida, Iowa, Kansas, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia and Wisconsin (collectively, the "Indirect Purchaser States").

9.    Plaintiff further seeks on behalf of herself and the Class equitable remedies as to Defendants' unjust enrichment.

## JURISDICTION AND VENUE

10.    Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. §§ 22 and 26. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367(a).

11.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), which provides federal district courts with original jurisdiction over civil actions in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and is a class action in which "any member of a class of plaintiffs is a citizen of a state different from any defendant."

12.    Venue in this District is proper under 15 U.S.C. §22 and 28 U.S.C. §1391(b) because Defendants are found or transact business within this District, and the interstate trade and commerce, hereinafter described, is carried out, in substantial part, in this District.

## TRADE AND COMMERCE

13.    At all relevant times, TriCor® was manufactured by Defendants and was thereafter sold, shipped and transported across state lines to United States customers located outside the state of manufacture. In connection with the purchase and sale of TriCor®, monies,

5

as well as contracts, bills, and other forms of business communications and transactions, were transmitted in a continuous and uninterrupted flow across state lines. Various means and devices were used to effectuate the Defendants' actions alleged herein, including the United States mail, interstate travel, interstate telephone commerce, and other forms of interstate electronic communications. The activities of Defendants alleged herein were within the flow of, and have substantially affected, interstate commerce.

## THE PARTIES

### Plaintiff

14.     Plaintiff Cindy Cronin resides in Valley Center, California and purchased fenofibrate in California, one of the Indirect Purchaser States, during the Class Period.

### Defendants

15.     Defendant Abbott Laboratories ("Abbott") is a corporation organized, existing, and doing business under the laws of the state of Illinois. Its office and principal place of business is located at 100 Abbott Park Road, Abbott Park, Illinois 60064. Abbott is engaged principally in the development, manufacture, and sale of pharmaceuticals and health care products and services. Abbott had sales of $19.7 billion in 2004. Abbott operates in 130 countries and has facilities in 14 states.

16.     Defendants Fournier Industrie et Sante, (formerly known as Fournier Innovation et Synergic), and Laboratoires Fournier, S.A. (collectively "Fournier" and collectively with Abbott "Defendants"), are French corporations having their principal place of business at 42 Rue de Longvie, 21300 Chenove, France. Abbott is the licensee from Fournier of the five patents listed in the Orange Book for TriCor® products.

6

## RELEVANT MARKET

17.     The relevant product market in which to assess the anticompetitive effect of

Defendants' conduct is the market for fenofibrate products, which consists of TriCor® products

and generic bioequivalent versions of TriCor® products.  Upon final approval from the FDA,

generic fenofibrate products will be reasonably interchangeable and have a strong cross-elasticity

of demand with TriCor® products.

18.     The relevant geographic market is the United States as a whole (for Counts I and

III) and the Indirect Purchaser States (for Count II).

19.     At all relevant times, Defendants' market share in the relevant product and

geographic markets was and is between 95% and 100%.

## FACTUAL ALLEGATIONS

### The Federal Scheme For Approval of Generic Drugs

20.     Under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, *et seq.*, (the

"FFDCA"), approval by the FDA is required before a new drug (often referred to as a "pioneer

drug"), can be manufactured and sold in the United States.  Approval for a new drug requires the

filing of a New Drug Application ("NDA") with the FDA demonstrating that the drug is safe and

effective for its intended use.  New drugs that are approved for sale in the United States by the

FDA are often covered by patents and marketed under a brand name.

21.     Generic drugs are products that the FDA has found to have the same active

chemical composition and provide the same therapeutic effects as the corresponding pioneer,

brand-name drugs.  If a generic drug is determined to be bioequivalent to a corresponding

7

pioneer or brand-name drug, the FDA assigns the generic drug an "AB" rating. According to the FDA, a bioequivalent generic drug rated "AB" may be used and substituted interchangeably with the referenced branded drug.

22.    Once the safety and efficacy of a new drug is approved by the FDA, that drug may be made available to customers in the United States only under the direction and care of a physician who writes a prescription specifying the drug by name, and only from a licensed pharmacist. The pharmacist must fill the prescription with the drug brand specified by the physician, unless an AB-rated generic version of that pioneer drug which has been approved by the FDA is available. Once a physician writes a prescription for a brand-name drug, such as TriCor® capsules, that prescription can be filled only with the drug named in the prescription or an AB-rated generic equivalent. Only generic drugs which carry the FDA's "AB" rating may be substituted by a pharmacist for the physician-prescribed brand-name drug.

23.    If an AB-rated generic formulation of a brand-name drug exists and the physician has not specifically indicated on the prescription "DAW" or "dispense as written" (or similar indications, the wording of which varies slightly from state to state), then: (a) for consumers covered by most prescription drug benefit plans, the pharmacist will substitute the generic drug; and (b) for consumers whose purchases are not covered by prescription drug benefit plans, the pharmacist will offer the consumer the choice of purchasing the AB-rated generic at a lower price.

24.    Generic drugs are invariably priced below the branded drugs to which they are bioequivalent. A 1998 study conducted by the Congressional Budget Office ("CBO") concludes that the purchase of generic drugs saved consumers and third party payors between $8-10 billion

8

in a single year. The study also concludes that the average price of brand-name drugs facing generic competition is less than the average price of brand-name drugs without generic competition.

25.    Similarly, an August, 2000 Government Accounting Office report observes: "Because generic drugs are not patented and can be copied by different manufacturers, they often face intense competition, which usually results in much lower prices than brand-name drugs."

26.    A branded drug loses a significant portion of its market share to generic competitors less than a year after the introduction of generic competition, even if the brand-name manufacturer lowers prices to meet competition. In testimony before Congress, a representative from the Pharmaceutical Research and Manufacturers of America (a brand-name pharmaceutical manufacturers' trade association), confirmed that "in most cases, sales of pioneer medicines drop as much as 75 percent within weeks after a generic copy enters the market."

**The Hatch-Waxman Act**

27.    In 1984, Congress enacted legislation, commonly known as the "Hatch-Waxman Act," to establish an abbreviated process to expedite and facilitate the development and approval of generic drugs. 21 U.S.C. § 355.

28.    The Hatch-Waxman Act (the "Act") permits a generic drug manufacturer to file an Abbreviated New Drug Application ("ANDA") that incorporates by reference the safety and efficacy data developed and previously submitted in the NDA process by the company that manufactured the pioneer drug.

29.    The FDA maintains and publishes *Approved Drug Products with Therapeutic Equivalence Evaluations* (commonly known as the "Orange Book"), which lists all prescription

9

drugs approved for use in the United States and the patents, if any, covering those drugs.

30.    With regard to patents listed in the Orange Book, an ANDA applicant must make one of four certifications in accordance with FFDCA Section 355(j)(2)(A)(vii):

I.      that no patent for the pioneer drug has been filed with the FDA;

II.     that the patent for the pioneer drug has expired;

III.    that the patent for the pioneer drug will expire on a particular date and the generic company does not seek to market its generic product before that date (a "Paragraph III Certification"); or

IV.    that the patent for the pioneer drug is invalid or will not be infringed upon by the generic company's proposed product (a "Paragraph IV Certification").

31.    If an ANDA includes a Paragraph IV Certification, the applicant must notify the pioneer drug patent owner of the certification.

32.    The Act then affords the pioneer drug patent owner 45 days after receipt of Paragraph IV Certification notification to initiate a patent infringement lawsuit against the ANDA applicant.  If no lawsuit is initiated during this 45-day window, the process for FDA approval of the generic product continues.

33.    If a patent infringement suit is commenced within the 45-day window, FDA final approval of the ANDA is automatically stayed until the earliest of: (a) the expiration of the patent; (b) the expiration of 30 months from the patent holder's receipt of notice of the Paragraph IV Certification (the "30-month stay"); or (c) a final judicial determination of non-infringement or patent invalidity.

34.    The Act also provides the first filer of an ANDA with a Paragraph IV Certification with a 180-day period in which to market its generic version on an exclusive basis

10

(the "180-day exclusivity period").

35.    The 180-day exclusivity period is triggered by either: (a) commercial marketing of the generic product, or (b) a final court decision that the patent at issue is either invalid or not infringed.

36.    Prior to the expiration of the 30-month stay, the FDA may grant "tentative" approval of an ANDA once it determines that all the criteria for "final" approval have been satisfied.

37.    The Act expressly permits the FDA to grant final approval to the first filed ANDA, and an ANDA applicant with FDA approval may market its generic product in the United States while the patent infringement lawsuit remains unresolved.

38.    Thus, the practical result of the Act is that, if a patent is listed in the Orange Book, the pioneer drug patent holder need only file a patent infringement lawsuit within the 45-day window in order to block FDA approval of an ANDA applicant's generic drug from entering the market for up to 30 months.

39.    The Medicare Prescription Drug Improvement and Modernization Act of 2003, signed by President Bush on December 8, 2003, changed certain provisions of the Hatch-Waxman Act to curtail abuses by pharmaceutical manufacturers, such as precluding multiple 30-month stays.

## Fenofibrate Products

40.    Pharmaceutical products with the API fenofibrate reduce high levels of low-density lipoprotein cholesterol ("LDL-C"), sometimes referred to as "bad cholesterol," and triglycerides by promoting the dissolution and elimination of fat particles in the blood.

11

Fenofibrate products also increase levels of high-density lipoprotein cholesterol ("HDL-C"), sometimes referred to as "good cholesterol," and reduce LDL-C in patients with primary hypercholesterolemia (high bad cholesterol) or mixed dyslipidemia (high bad cholesterol and high triglycerides). Fenofibrate products are also effective at reducing triglycerides in patients with hypertriglyceridemia (high triglycerides).

41.     On February 9, 1998, Abbott received final approval for NDA No. 019304 for 67 mg fenofibrate capsules. On June 30, 1999, Abbott received final approval for 134 mg and 200 mg fenofibrate capsules. In connection with fenofibrate capsules, Abbott submitted to the FDA for listing in the Orange Book Patent No. 4,984,726 (the "'726 patent"), which was granted on January 23, 1990 to Fournier and exclusively licensed to Abbott in 1997.

## Generic Manufacturers Apply To Market Fenofibrate Products

42.     On December 14, 1999, Novopharm Ltd. filed an ANDA for 67 mg fenofibrate capsules (the "Capsule ANDA"). Novopharm sought approval to market its fenofibrate capsule product prior to the expiration of the '726 patent. Novopharm certified that its product did not infringe the '726 patent, and duly and timely notified Abbott of its ANDA. The ANDA was amended on March 31, 2000 and November 27, 2000 to include the 134 mg and 200 mg strength capsules. In April 2000, Novopharm was acquired by Teva Pharmaceutical Industries, Ltd. ("Teva").

43.     Other generic manufacturers subsequently sought to market fenofibrate capsules, including Impax Laboratories, Inc. (ANDA filed May 9, 2000) and Reliant Pharms Inc. (NDA filed December 1, 2003).

44.     On April 7, 2000, Defendants sued Novopharm and Teva in the United States

12

District Court for the Northern District of Illinois for infringement of the '726 patent based on Novopharm's Capsule ANDA for 67 mg and 200 mg fenofibrate capsules. Abbott's and Fournier's lawsuit triggered the automatic 30-month stay under the Hatch-Waxman Act, preventing the FDA from granting final approval to Novopharm's Capsule ANDA. Abbott and Fournier also sued Impax in the Northern District of Illinois, giving rise to a 30-month stay.

## Defendants' First Market Switch: Capsules to Tablets

45.    Along with its NDA for fenofibrate capsules, Abbott also held NDA No. 021203 for 54 mg and 160 mg fenofibrate tablets, which the FDA approved on September 4, 2001. Abbott and, through its licensing agreement, Fournier, thereafter sold 54 mg and 160 mg fenofibrate tablets in the United States under the brand name TriCor®. Abbott's sales of TriCor® tablets have since accounted for over 95% of all sales of fenofibrate products, and 100% of all fenofibrate tablet sales, in the United States. For the twelve months ending September 2004, these products had sales in the United States in excess of $750 million.

46.    After the FDA approved Abbott's NDA for fenofibrate tablets, Abbott and Fournier took affirmative steps to destroy the market for generic fenofibrate capsules. Abbott and Fournier removed the fenofibrate capsule code from the National Drug Data File® ("NDDF"), and they removed (or "obsoleted") TriCor® brand fenofibrate capsules from the market.

47.    The NDDF is a widely accepted database provided by First Databank, Inc. that includes drug descriptions and pricing information with an extensive array of clinical decision-support modules. This electronic drug information encompasses every drug approved by the FDA, including generic alternatives, and is used throughout the healthcare industry. The NDDF

listing is crucial because the pharmacist filling a prescription written for TriCor® capsules is advised by a code reference in the database that a lower cost generic version of the drug is available. In most cases, a pharmacist will then fill that prescription with the generic version, unless the prescription specifically states otherwise. By removing TriCor® capsules from the NDDF, the branded drug code reference no longer exists for purposes of generic substitution laws or for purposes of health care providers' pharmaceutical benefit programs.

48.    When Defendants removed their fenofibrate capsules from the market, they also changed Abbott's sales force and stopped detailing the capsule formulation in the market. By removing the capsule code from the NDDF, Abbott and Fournier rendered the TriCor® capsule code, to which Teva's capsules would have been compared, obsolete.

**Teva's Pyrrhic Victory on Fenofibrate Capsules –**
**Approval For a Product That Could No Longer Be Marketed as a Generic**

49.    On March 19, 2002, the Illinois court granted Teva's motion for summary judgment of non-infringement of the '726 patent, clearing the way for Teva to market its fenofibrate capsule product. On March 26, 2003, the Illinois court granted Impax's motion for summary judgment of non-infringement as well.

50.    On April 9, 2002, as a result of the non-infringement decision, Teva received final FDA approval to market its 134 mg and 200 mg fenofibrate capsule products, and tentative FDA approval to market its 67 mg fenofibrate capsule products. Teva began to sell its 134 mg and 200 mg fenofibrate capsule products in April 2002. As the first filer of a capsule ANDA with a Paragraph IV certification, Teva was granted a six-month exclusivity period during which the FDA would not grant final approval to another fenofibrate capsule ANDA. During an

14

exclusivity period for a blockbuster drug such as TriCor® capsules, Teva could reasonably expect to make well more than $100 million in sales at prices substantially less than the price for branded TriCor® capsules.

51.     However, Defendants' anticompetitive tactics rendered a Pyrrhic victory Teva's favorable decision and award of an otherwise valuable exclusivity period. Defendants' removal of TriCor® capsules from the NDDF meant that there was no longer a brand reference drug for Teva's fenofibrate capsules. Abbott's and Fournier's only purpose in removing the capsule code from the NDDF was to foreclose generic competition from Teva and other generic manufacturers in the fenofibrate product market. Had the capsule code been maintained in the NDDF, there would still have been a reference for which Teva's generic capsules could have been substituted. Without Abbott's and Fournier's branded TriCor® capsule code as a reference, however, and without the continuation of Abbott's capsules in the marketplace, there was no longer a market for generic fenofibrate capsule products. Accordingly, most of the fenofibrate capsules that Teva had shipped to its customers were returned. Teva was effectively blocked from the market as a generic competitor in the fenofibrate market.

52.     On October 7, 2002, the statutory 30-month stay on FDA approval of Teva's Capsule ANDA for 67 mg fenofibrate capsules ended, allowing Teva to enter the then-defunct capsule market with that dosage. On October 23, 2003, Impax was granted final approval to market its fenofibrate capsule products.

## Teva Files ANDA to Market Fenofibrate Tablets

53.     Blocked from the fenofibate capsule market, Teva next sought to market generic fenofibrate tablets. On June 17, 2002, Teva filed with the FDA an ANDA for its generic

15

fenofibrate 54 mg and 160 mg tablets (the "Tablet ANDA"). In connection with its Tablet ANDA, Teva submitted a Paragraph IV certification that the ANDA did not infringe the '726 Patent, as well as two additional patents, U.S. Patent No. 6,074,670 (the "670 Patent") and U.S. Patent No. 6,277,405 (the "405 Patent"). On August 21, 2002, Teva notified Defendants of the filing of the Tablet ANDA and the concomitant Paragraph IV.

54.    In response, Defendants filed patent infringement action Civil Action No. 02-1512, which asserts that Teva's Tablet ANDA infringes the '726 Patent, the '670 Patent, and the '405 Patent. Defendants' action triggered an automatic 30-month stay under the Hatch-Waxman Act that prevents the FDA from granting final approval to Teva's Tablet ANDA as long as the statutory stay remains in effect.

55.    On July 23, 2003, Defendants listed U.S. Patent No. 6,589,552 (the "552 Patent") in the Orange Book for TriCor® 54 mg and 160 mg tablets.

56.    By July 29, 2003, Teva had supplemented its Tablet ANDA by filing a Paragraph IV certification to the '552 Patent. By July 29, 2003 Teva gave notice to Defendants of the filing of its Paragraph IV certification to the '552 Patent.

57.    In response to Teva's Paragraph IV certification to the '552 Patent, Defendants filed patent infringement action Civil Action No. 03-847 on August 29, 2003, alleging that Teva's Tablet ANDA infringes the '552 Patent. Defendants' action triggered *another* 30-month automatic stay period under the Hatch-Waxman Act. This successive 30-month stay commenced before the December 2003 amendments to the Hatch-Waxman Act and, absent a court decision, will continue in effect more than one year after the first 30-month stay that went into effect with the filing of the first action, C.A. No. 02-1512.

16

## Defendants Submit NDA for New Tablet Formulations

58.    On October 29, 2003, Defendants submitted NDA No. 021656 to the FDA for their new version of TriCor® fenofibrate tablets in 48 mg and 145 mg dosage forms. Defendants did not seek FDA approval for this new formulation product until after they knew that Teva had developed generic fenofibrate tablets and was seeking approval to sell those tablets in the United States.

59.    On December 12, 2003, Defendants listed U.S. Patent No. 6,0652,881 (the "881 Patent") in the Orange Book for TriCor® 54 mg and 160 mg tablets.

60.    On December 17, 2003, Teva supplemented its Tablet ANDA by filing a Paragraph IV certification regarding the '881 Patent and notified Defendants of the certification.

61.    Defendants responded by filing patent infringement action Civil Action No. 04-0047 on January 22, 2004, which alleges that Teva's Tablet ANDA infringes the '881 Patent. Fortunately, because of the December 2003 amendments to the Hatch-Waxman Act, another 30-month stay was not available.

## Teva Granted Tentative Approval For 54 mg and 160 mg Fenofibrate Tablets

62.    On March 5, 2004, the FDA granted tentative approval to Teva's Tablet ANDA. By granting tentative approval, the FDA indicated that Teva's fenofibrate 54 mg and 160 mg tablets are bioequivalent to TriCor® tablets of the same dosage strengths. However, due to the successive 30-month stays resulting automatically from Defendants' filing and maintenance of their patent infringement actions against Teva concerning Teva's Tablet ANDA, the FDA was legally precluded from granting final approval to Teva's Tablet ANDA until the stays expire or a court enters judgment in Teva's favor.

17

Defendants' Second Market Switch

63.    On November 5, 2004, Abbott announced that it had received FDA approval to market the 48 mg and 145 mg TriCor® fenofibrate tablets. The new version tablets replace Abbott's 54 mg and 160 mg tablet dosage forms and are indicated for the exact same uses as the 54 mg and 160 mg tablet dosage forms.

64.    Defendants are marketing their new 48 mg and 145 mg TriCor® tablet products, and have ceased supplying the market with the 54 mg and 160 mg TriCor® tablets. The supply of Defendants' 54 mg and 160 mg TriCor® tablets soon disappeared and Defendants removed the brand reference code from the NDDF.

65.    On May 16, 2005, after the 30-month stay expired, Teva announced that the FDA granted final approval for their Tablet ANDA for 54 mg and 160 mg fenofibrate tablets. That same day, Defendants informed the judge presiding over the patent infringement actions that "they no longer wish to prosecute their consolidated patent infringement action against Teva and Impax." Defendants, having effectively delayed generic competition through the filing of their patent infringement litigation, no longer found the prosecution of such claims desirable.

The Effects of Defendants' Anti-Competitive Conduct
on the United States Market for Fenofribrate Products

66.    The purpose of Defendants' anti-competitive conduct is to obtain and maintain monopoly power in the market for fenofibrate products and their generic bioequivalents. But for the anticompetitive actions alleged herein, generic versions of TriCor® capsules would have been available to consumers in April 2002. When Teva launched its fenofibrate capsules in

18

April 2002, however, no branded reference was available because Abbott had taken the unprecedented step of removing its brand reference code from the NDDF.

67.    Removing TriCor® capsules from the NDDF eliminated the branded drug code reference for purposes of generic substitution laws or health care providers' pharmaceutical benefit programs. Thus, had Abbott not withdrawn TriCor® capsules from the NDDF, a pharmacist filling a prescription written for TriCor® capsules after April 2002 would have been advised by a code reference in the database that a lower cost generic version of the drug was available. That pharmacist could have substituted, and often would have been required to substitute, the generic version in filling the prescription. Similarly, prescription benefit plans that provide for tiered co-payment arrangement are designed to steer consumers to lower cost generic drugs by requiring higher co-payments for branded drugs, e.g., a branded co-payment might be $25, but only $10 for the generic version of the same drug. These incentives result in a brand name drug quickly losing a significant portion of its market share soon after the introduction of generic competition, even if the brand name manufacturer lowers its price to meet competition. This is the very generic competition that Congress sought to facilitate when it adopted the Hatch-Waxman Act in 1984.

68.    Defendants herein have gamed the system to undermine the purposes of the Hatch-Waxman Act and preclude consumer access to lower-cost generic fenofibrate products. Their conduct has assured that prescriptions for TriCor® capsules cannot be filled by the pharmacist at all, not even with a bioequivalent substitute marketed by Teva. Similarly, an insured consumer attempting to fill a prescription for TriCor® capsules will not be able to do so, and will not have the option of substituting a generic version for a lower co-payment.

19

69.    Because the code reference for TriCor® capsules does not exist, Teva could not sell its fenofibrate capsules as a generic drug. In fact, most of the fenofibrate capsules that Teva shipped after the launch in 2002 were subsequently returned by customers because they could not be sold. Teva was forced to market its fenofribate capsules as a branded product (under the trade name Lofibra®) without the benefits of a generic classification for purposes of generic substitution laws or lower prescription benefit co-payments. Teva, like most generic manufacturers, does not employ an extensive marketing department like brand-name manufacturers and Lofibra® sales have been negligible (in the range of about $4 million per year), barely scratching the surface of Defendants' fenofibrate monopoly. Other generic manufacturers have received FDA final approval to market fenofibrate capsules (Impax Labs on October 27, 2003 and Reliant Pharms on November 30, 2004), but they face the same barriers as Teva in penetrating Defendants' unlawfully protected monopoly.

70.    By foreclosing the ability of generic manufacturers to market generic products, Defendants' anticompetitive acts imposed significant barriers to market entry on its would-be generic competitors and allowed Defendants to maintain supracompetitive prices for their fenofibrate products.

71.    Defendants repeated this maneuver with the market shift to new tablet formulations, ensuring that even if prescriptions for the 54 mg and 160 mg tablet formulations are written, no generic substitutions will be allowed. Defendants have ceased distribution of their 54 mg and 160 mg tablet formulations to the market and removed the reference code in the NDDF for their 54 mg and 160 mg tablet formulations. Without this reference code, it is illegal for a pharmacist to substitute a generic alternative of the 54 mg and 160 mg formulations for any

20

prescription for the 54 mg and 160 mg tablet formulations.

72.    Defendants' removal of the reference code in the NDDF for its 54 mg and 160 mg tablet formulations also will make it more expensive for any patients to use Teva's fenofibrate tablets in the event that a physician writes a prescription for 54 mg and/or 160 mg fenofibrate formulations. Patients will be forced to pay higher co-payment amounts for Teva's 54 mg or 160 mg fenofibrates tablets when there is no reference code for Abbott's and Fournier's TriCor® 54 mg or 160 mg tablets in the NDDF than they would be required to pay for generic manufacturers' product if Abbott and Fournier maintained the reference in the NDDF. This is because, without a reference code in the NDDF for TriCor® 54 mg or 160 mg tablets, generic manufacturers' tablets will be treated as branded product rather than a generic product if listed in the NDDF, which would lead prescription benefit providers to require higher co-payments.

73.    Consumers attempting to purchase a fenofibrate product will be made financially aware of Defendants' scheme. For example, online retailer Drugstore.com sells most branded and generic drugs, and encourages generic substitution with immediate price comparisons. Drugstore.com describes the general difference between generic and brand medications on their website:

### Generic vs. Brand Medications

Generic medicines are approved for use by the Food and Drug Administration (FDA) and are therapeutically equivalent to brand name products. In almost all cases, generics work just as well as their brand-name siblings and often cost considerably less.

Most states allow pharmacists to substitute a generic when appropriate and when you and your doctor authorize it. Our pharmacy is located in New Jersey, so we substitute generic drugs recognized as interchangeable under New Jersey law. If you and your doctor have authorized the use of generic medicines, our pharmacy

21

will substitute your prescription with the generic equivalent.

http://www.drugstore.com/cat/10661/tmpl/default.asp?catid=15610&trx=9885&trxp1=15610&tr

xp2=topic&trxp3=15574 (last visited July 11, 2005).

74.    An inquiry on Drugstore.com for a branded drug with an available generic

version, such as Cipro®, indicates that the 500 mg formulation of brand-name Cipro® costs

$148.99 and $433.97 for the 30 tablet and 90 tablet amounts, respectively.  Generic ciproflaxin

in the same dosage and tablet amounts costs only $121.71 and $360.64, respectively.  Source:

http://www.drugstore.com/pharmacy/prices/drugprice.asp?ndc=00026851351&trx= 1Z5006 (last

visited July 11, 2005).

75.    Significantly, an inquiry on Drugstore.com for "tricor" reveals pricing only exists

for the branded drug.  For example, the 48 mg formulation in 30 tablet and 90 tablet amounts

costs $35.32 and $98.68, respectively, and the 145 mg formulation in 30 tablet and 90 tablet

amounts costs $ 93.50 and $264.91, respectively.  Source: http://www.drugstore.com/

pharmacy/drugindex/rxsearch.asp?search=tricor (last visited July 11, 2005).  There is no

reference to TriCor® capsules (which no longer exist), TriCor® tablets in 54 mg, 67 mg or 160

mg strength (since Abbott has already cut off the supply), generic versions of those products, or

Lofibra® capsules, which is not a generic bioequivalent to the tablets.

76.    An inquiry for "fenofibrate" will also bring up a reference to Lofibra® capsules as

a branded drug without a generic alternative, priced for the 67 mg formulations in the 30 tablet

and 90 tablet amounts as $26.24 and $69.29, respectively; for the 134 mg formulations in the 30

tablet and 90 tablet amounts as $48.29 and $133.34, respectively; and for the 200 mg

formulations in the 30 tablet and 90 tablet amounts as $73.49 and $205.79, respectively.  Source:

22

http://www.drugstore.com/pharmacy/drugindex/rxsearch.asp?search=fenofibrate (last visited
July 11, 2005).

77.    As a result of Defendants' anti-competitive conduct, Plaintiff and the Class have
been financially injured. First, Plaintiff and the Class have never had the opportunity to realize
savings for lower-cost generic versions of fenofibrate products. Second, while Defendants have
maintained their monopoly for fenofibrate products and generic equivalents, Plaintiff and the
Class have paid and reimbursed supra-competitive and artificially high prices for TriCor®
products.

78.    Defendants had and have no legitimate justification, economic or otherwise, for
committing the violations of law alleged herein. Abbott's and Fournier's conduct in ending sales
of certain strengths or formulations of their TriCor® tablets and their TriCor® capsules is purely
private conduct. Removing a product reference from the NDDF does not involve any
governmental petitioning activity.

## CLASS ALLEGATIONS

79.    Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil
Procedure, sub-sections 23(a) and 23(b)(2) and/or (b)(3), on behalf of a class defined as follows:

> All persons or entities in the United States and its territories who purchased, paid
> and/or reimbursed for fenofibrate products, including TriCor® tablets and
> TriCor® capsules, intended for consumption by themselves, their families, or
> their members, employees or insureds (the "Class") during the period from April
> 9, 2002 through such time in the future as the effects of Defendants' illegal
> conduct, as alleged herein, have ceased (the "Class Period"). Excluded from the
> Class are all Defendants and their respective subsidiaries and affiliates, all
> governmental entities, and all persons or entities that purchased fenofibrate
> products: (i) for purposes of resale, or (ii) directly from any of the Defendants.

Count II applies to purchases of fenofibrate products in the Indirect Purchaser States.

80.    The members of the Class are so numerous that joinder of all members is impracticable. Purchasers of fenofibrate products during the Class Period number in the millions nationally, and there are, at a minimum, thousands of fenofibrate purchasers in each state.

81.    Defendants' unlawful, anti-competitive and inequitable methods, acts and trade practices have targeted and affected all members of the Class in a similar manner, *i.e.*, they have been overpaying for fenofibrate products due to the absence of competing generic versions of TriCor® tablets and TriCor® capsules in the marketplace, and will continue to pay supra-competitive prices so long as Defendants' scheme continues. Among the questions of law and fact common to the Class are:

(a)    whether Defendants' conduct as alleged violates federal and state antitrust and/or consumer protection laws;

(b)    whether Defendants have monopolized and attempted to monopolize the market for fenofibrate products;

(c)    whether Defendants intentionally and unlawfully excluded competitors and potential competitors from the market for fenofibrate products and generic bio-equivalents of TriCor® formulations;

(d)    whether Plaintiff and members of the Class are entitled to equitable and/or injunctive relief;

(e)    the amount of the overcharges or amounts paid or reimbursed by members of the Class for fenofibrate products over and above the amounts they would have paid or reimbursed in a competitive market unaffected by Defendants' illegal acts as alleged herein; and

(f)    whether Defendants unjustly enriched themselves to the detriment of Plaintiff and the Class, entitling Plaintiff and the Class to disgorgement of all monies resulting therefrom.

82.    Plaintiff's claims are typical of those of the Class she represents because Plaintiff and all of the Class members were injured and continue to be injured and/or threatened with

24

injury in the same manner by Defendants' unlawful, anti-competitive and inequitable methods, acts and practices, *i.e.*, they have paid and continue to pay supra-competitive prices for fenofibrate products and will continue to be forced to do so until the relevant market is truly competitive and prices have stabilized to competitive levels.

83.     Plaintiff will fully and adequately protect the interests of all members of the Class. Plaintiff has retained counsel who are experienced in antitrust and consumer class action litigation. Plaintiff has no interests which are adverse to, or in conflict with, other members of the Class.

84.     The questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members.

85.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty likely to be encountered in the management of this action that would preclude its maintenance as a class action.

86.     In addition, Defendants have acted and refused to act, as alleged herein, on grounds generally applicable to the Class.

**COUNT I**
**(INJUNCTIVE RELIEF UNDER § 16 OF THE CLAYTON ACT**
**FOR VIOLATIONS OF § 2 OF THE SHERMAN ACT)**

87.     Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

88.     As alleged above, Defendants knowingly and willfully engaged in a course of conduct designated to unlawfully maintain and prolong their monopoly position in the market for fenofibrate products in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.

25

89.    Plaintiff and the other members of the Class have been injured in their business or property by reason of Defendants' antitrust violation alleged in this Count.  Their injury consists of being deprived of the ability to purchase less expensive, generic fenofibrate products, and paying higher prices for TriCor® products than they would have paid in the absence of the antitrust violation.  The injury to Plaintiff and the Class is the type of injury that antitrust laws were designed to prevent, and the injury flows from Defendants' unlawful conduct.  Plaintiff and members of the Class are threatened with further injuries as a result of Defendants' continuing scheme, as alleged herein.

90.    Plaintiff and the Class seek equitable and injunctive relief pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anti-competitive market effects caused by the unlawful conduct of Defendants, and other relief so as to assure that similar anti-competitive conduct does not occur in the future.

## COUNT II
### (FOR COMPENSATORY AND MULTIPLE DAMAGES UNDER THE ANTITRUST AND/OR CONSUMER PROTECTION STATUTES OF THE INDIRECT PURCHASER STATES)

91.    Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

92.    Defendants' conduct alleged herein constitutes unlawful acts of monopolization and attempts to monopolize, as well as prohibited practices and unconscionable conduct under the antitrust and/or unfair and deceptive trade practices acts of the Indirect Purchaser States, as follows:

a.    Arizona:  The aforementioned practices by Defendants were and are in

26

violation of the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. §§ 44-1401, *et seq.*, the

Arizona Consumer Fraud Act, Ariz. Rev. Stat §§ 44-1521, *et seq.*, and the Constitution of the

State of Arizona, Article 14, §15;

      b.    <u>California</u>:  The aforementioned practices by Defendants were and are in

violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.*, and the California

Unfair Competition Act, Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

      c.    <u>District of Columbia</u>:  The aforementioned practices by Defendants were

and are in violation of the District of Columbia Antitrust Act, D.C. Code §§ 28-4501, *et seq.*;

      d.    <u>Florida</u>:  The aforementioned practices by Defendants were and are in

violation of the Florida Antitrust Act, Fla. Stat. Ann. §§ 542.15, *et seq.*, and the Florida

Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. §§ 501.201, *et seq.*;

      e.    <u>Iowa</u>:  The aforementioned practices by Defendants were and are in

violation of the Iowa Competition Law, Iowa Code §§ 553.4, 553.5 (1997);

      f.    <u>Kansas</u>:  The aforementioned practices by Defendants were and are in

violation of the Kansas Monopolies and Unfair Trade Act, Kan. Stat. Ann. §§ 50-101, *et seq.*,

and the Kansas Consumer Protection Act, Kan. Stat. Ann §§ 50-623, *et seq.*;

      g.    <u>Louisiana</u>:  The aforementioned practices by Defendants were and are in

violation of the Louisiana Monopolies Law, La. Rev. Stat. Ann. §§ 51:121, *et seq.,* and the

Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. §§ 51:1401,

*et seq.*;

      h.    <u>Maine</u>:  The aforementioned practices by Defendants were and are in

violation of the Maine Monopolies and Profiteering Statute, Me. Rev. Stat. Ann. tit. 10, §§ 1101,

27

*et seq.*, and the Maine Unfair Trade Practices Act, Me. Rev. Stat. Ann. tit. 5, §§ 205-A, *et seq.*;

      i.     <u>Massachusetts</u>:  The aforementioned practices by Defendants were and are in violation of the Massachusetts Antitrust Act, Mass. Gen. Laws, ch. 93, and the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A;

      j.     <u>Michigan</u>:  The aforementioned practices by Defendants were and are in violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws §§445.771, *et seq.*, and the Michigan Consumer Protection Act, §§ 445.901, *et seq.*;

      k.     <u>Minnesota</u>:  The aforementioned practices by Defendants were and are in violation of the Minnesota Antitrust Law of 1971, Minn. Stat. §§ 325D.49, *et seq.*, and the Minnesota Consumer Fraud Act, Minn. Stat §§ 325F.67, *et seq.*;

      l.     <u>Mississippi</u>:  The aforementioned practices by Defendants were and are in violation of Miss. Code Ann. §§ 75-21-1, *et seq.*;

      m.     <u>Nebraska</u>:  The aforementioned practices by Defendants were and are in violation of Ne. Rev. Stat. §§ 59-801, *et seq.*;

      n.     <u>Nevada</u>:  The aforementioned practices by Defendants were and are in violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. §§ 598A.010, *et seq.*, and the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §§ 598.0903, *et seq.*;

      o.     <u>New Jersey</u>:  The aforementioned practices by Defendants were and are in violation of the New Jersey Antitrust Act, N.J. Stat. Ann. §§ 56:9-1, *et seq.*, and the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1, *et seq.*;

      p.     <u>New Mexico</u>:  The aforementioned practices by Defendants were and are in violation of the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1, *et seq.*, and the New

28

Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1, *et seq.*;

      q.    <u>New York</u>: The aforementioned practices by Defendants were and are in violation of the Donnelly Act, N.Y. Gen. Bus. Law §§ 340, *et seq.*, and the New York Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law §§ 349, *et seq.*;

      r.    <u>North Carolina</u>: The aforementioned practices by Defendants were and are in violation of North Carolina's antitrust and unfair competition law, N.C. Gen. Stat. §§ 75-1, *et seq.*;

      s.    <u>North Dakota</u>: The aforementioned practices by Defendants were and are in violation of the North Dakota Antitrust Act, N.D. Cent. Code §§ 51-08.1-01, *et seq.*, and the North Dakota Consumer Fraud Act, N.D. Cent. Code §§ 51-15-01, *et seq.*;

      t.    <u>South Dakota</u>: The aforementioned practices of Defendants were and are in violation of South Dakota's antitrust law, S.D. Codified Laws §§ 37-1-3, *et seq.,* and deceptive trade practices and consumer protection law, S.D. Codified Laws §§ 37-24-1, *et seq.*;

      u.    <u>Tennessee</u>: The aforementioned practices of Defendants were and are in violation the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101, *et seq.*, and the Consumer Protection Act, Tenn. Code Ann. §§ 47-18-101, *et seq.*;

      v.    <u>Vermont</u>: The aforementioned practices of Defendants were and are in violation of the Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9, §§ 2451, *et seq.*;

      w.    <u>West Virginia</u>: The aforementioned practices by Defendants were and are in violation of the West Virginia Antitrust Act, W.Va. Code §§ 47-18-1, *et seq.*, and the West Virginia Consumer Credit and Protection Act, W. Va. Code §§ 46A-6-101, *et seq.*; and

      x.    <u>Wisconsin</u>: The aforementioned practices by Defendants were and are in

29

violation of the Wisconsin Antitrust Act, Wis. Stat. §§ 133.01, *et seq.*, and the Wisconsin Unfair

Trade Practices Act, Wis. Stat. §§ 100.20, *et seq.*

93.    As a result of Defendants' unlawful conduct, Plaintiff and the Class have

sustained and will continue to sustain substantial losses and damage to their businesses and

property in the form of, *inter alia*, being deprived of the ability to purchase less expensive,

generic versions of TriCor®, and paying prices for fenofibrate products that were higher than

they would have been but for Defendants' improper actions.  The full amount of such damages is

presently unknown and will be determined after discovery and upon proof at trial.

94.    Plaintiff and the Class seek compensatory and multiple damages, and other

damages as permitted by state law, for their injuries caused by these violations pursuant to these

statutes.

## COUNT III

### (FOR RESTITUTION, DISGORGEMENT AND CONSTRUCTIVE TRUST FOR UNJUST ENRICHMENT TO DEFENDANTS)

95.    Plaintiff repeats and realleges the preceding and subsequent paragraphs as though

set forth herein.

96.    As a result of their unlawful conduct described above, Defendants have been and

will continue to be unjustly enriched.  Defendants' unlawful acts include, for the reasons alleged

above, improperly withdrawing the reference code in the NDDF for TriCor® capsules in order to

impose barriers to entry for generic manufacturers seeking to compete in the Relevant Market.

Defendants have been unjustly enriched, to the detriment of Plaintiff and the Class, by the receipt

of, at a minimum, unlawfully inflated prices and illegal monopoly profits on their sale of

30

TriCor® products. Defendants have benefitted from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of their ill-gotten gains resulting from the overpayments for TriCor® products made by Plaintiff and the Class.

97.    Plaintiff and members of the Class are entitled to the amount of Defendants' ill-gotten gains resulting from Defendants' unlawful, unjust and inequitable conduct. Plaintiff and the Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiff and the Class members may make claims on a *pro rata* basis.

**WHEREFORE**, Plaintiff prays that:

(a)    this Court determine that this action may be maintained as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure with respect to Plaintiff's claims for declaratory, equitable and injunctive relief, and Rule 23(b)(3) of the Federal Rules of Civil Procedure with respect to the claims for damages; and declare Plaintiff as representative of the Class;

(b)    the conduct alleged herein be declared, adjudged and decreed to be in violation of Section 2 of the Sherman Act, of the statutes of the Indirect Purchaser States set forth above, and the common law of unjust enrichment;

(c)    Plaintiff and each member of the Class be awarded damages and, where applicable, treble, multiple, and other damages, according to the laws of the Indirect Purchaser States, including interest;

(d)    Plaintiff and each member of the Class recover the amounts by which Defendants have been unjustly enriched;

(e)    Defendants be enjoined from continuing the illegal activities alleged

31

herein;

(f)    Plaintiff and the Class recover their costs of suit, including reasonable

attorneys' fees and expenses as provided by law;

(g)    Plaintiff and the Class be granted such other and further as the Court

deems just and necessary.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury of all issues so triable in this case.

Dated: July 11, 2005

**CHIMICLES & TIKELLIS LLP**

By: _____

Pamela S. Tikellis (#2172)
Robert J. Kriner, Jr. (#2546)
A. Zachary Naylor (#4439)
Robert R. Davis (#4536)
P.O. Box 1035
One Rodney Square
Wilmington, DE 19899
Tel: 302-656-2500
Fax: 302-656-9053

**FINKELSTEIN, THOMPSON & LOUGHRAN**
L. Kendall Satterfield
Richard M. Volin
Karen J. Marcus
1050 30th Street, NW
Washington, DC 20007
Telephone: (202) 337-8000
Facsimile: (202) 337-8090

**KRAUSE, KALFAYAN, BENINK & SLAVINS**
Ralph B. Kalfayan
1010 Second Avenue, Suite 1750
San Diego, CA 92101-4906

32

Telephone: (619) 232-0331
Facsimile:  (619) 232-4019

**CHIMICLES & TIKELLIS LLP**
Michael D. Gottsch
Daniel B. Scott
361 West Lancaster Avenue
Haverford, PA  19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

# Exhibit B

Registered No.  RB85831449US

Date Stamp

| Handling Charge | $ $0.00 | Return Receipt | $ $1.75 |
| Postage | $ $3.13 | Restricted Delivery | $ $0.00 |

Received by

Customer Must Declare Full Value $   $0.00

☐ With Postal Insurance
☑ Without Postal Insurance

Domestic Insurance up to $25,000 is included in the fee. International Indemnity is limited. *(See Reverse).*

FROM
Chimicles + Tikellis LLP
ONE Rodney Square
P.O. Box 1035
Wilmington DE 19899

TO
ABBOTT LABORATORIES
ATTN: General Counsel
100 Abbott Park Road
Abbott Park, IL 60064

PS Form **3806,**   **Receipt for Registered Mail**   Copy 1 - Customer
June 2002   *(See Information on Reverse)*

---

**Declaration of Value:** *You must declare the full value* of all Registered Mail articles at the time of mailing.

**With Postal Insurance:** You can purchase postal insurance against loss or damage by paying the appropriate fee.

**Without Postal Insurance:** You can also send an article by Registered Mail without purchasing postal insurance. No indemnity is paid for uninsured articles.

**Indemnity Coverage:**

Domestic - Indemnity coverage for domestic Registered Mail is limited to the lesser of (1) the declared value of the article at the time of mailing if lost or totally damaged, or (2) the cost of repairs. Ask your postmaster for additional information about insurance limits and coverage. See *Domestic Mail Manual* S010 and S911 for limitations of coverage.

International - Indemnity coverage for international Registered Mail is limited to the maximum set by the Convention of the Universal Postal Union. Ask your postmaster and see the *International Mail Manual* for limitations of coverage and individual country prohibitions and restrictions.

**How to File a Claim:** You must file domestic claims within one year of the date the article was mailed. International indemnity claims for loss must be filed within six months of the date the article was mailed. Make claims for complete or partial loss of contents, damage, or alleged rifling immediately. For complete or partial loss or damage present (1) this receipt, (2) the article, container, and packaging; and, (3) evidence to substantiate your claim.

Please allow three months after you file to inquire about the status of

PS Form 3806, June 2002, (Customer Copy - Reverse)

Save this receipt for Registered Mail claims and inquiries

# Exhibit C

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

ABBOTT LABORATORIES
ATTN: General Counsel
100 ABBOTT PARK ROAD
ABBOTT PARK, IL 60064

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____ ☐ Agent
                        ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

Linda Corum    07/18/05

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
   ☐ Certified Mail      ☐ Express Mail
   ☒ Registered          ☐ Return Receipt for Merchandise
   ☐ Insured Mail        ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
   (Transfer from service label)    RB 858 314 490 US

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-154

---

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

Chimicles & Tikellis LLP
ONE Rodney SQUARE
P.O. Box 1035
WILMINGTON, DE 19899